# UNITED STATES DISTRICT COURT

for the

FILED20 OCT '26 13:37USDC-ORP

__________ District of __________

__________ Division

| | |
|---|---|
| Nicholas Margolies<br><br>Plaintiff(s)<br>*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*<br>-v-<br>Oregon Health & Science University<br><br>Defendant(s)<br>*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Case No. 3:26-cv-2301-IM<br>*(to be filled in by the Clerk's Office)*<br><br>Jury Trial: *(check one)* ☑ Yes ☐ No |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

**I. The Parties to This Complaint**

**A. The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Nicholas Margolies |
| Street Address | 3402 SW 11th Ave, Apt 4 |
| City and County | Portland, Multnomah |
| State and Zip Code | OR, 97239 |
| Telephone Number | 971 417 8926 |
| E-mail Address | nsmargolies@protonmail.com |

**B. The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | Oregon Health & Science University |
| Job or Title *(if known)* | |
| Street Address | 3181 SW Sam Jackson Park Rd |
| City and County | Portland, Multnomah |
| State and Zip Code | OR, 97239 |
| Telephone Number | 503-494-8311 |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

**C. Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Oregon Health & Science University |
| Street Address | 3181 SW Sam Jackson Park Rd |
| City and County | Portland, Multnomah |
| State and Zip Code | OR, 97239 |
| Telephone Number | 503-494-8311 |

## II. Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☐ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☑ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Other federal law *(specify the federal law)*:

☐ Relevant state law *(specify, if known)*:

☐ Relevant city or county law *(specify, if known)*:

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

- ☐ Failure to hire me.
- ☐ Termination of my employment.
- ☐ Failure to promote me.
- ☑ Failure to accommodate my disability.
- ☑ Unequal terms and conditions of my employment.
- ☑ Retaliation.
- ☐ Other acts *(specify)*:

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B. It is my best recollection that the alleged discriminatory acts occurred on date(s)

April 2024 - March 2025

C. I believe that defendant(s) *(check one)*:

- ☐ is/are still committing these acts against me.
- ☑ is/are not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

- ☐ race
- ☐ color
- ☐ gender/sex
- ☐ religion
- ☐ national origin
- ☐ age *(year of birth)* *(only when asserting a claim of age discrimination.)*
- ☑ disability or perceived disability *(specify disability)*

E. The facts of my case are as follows. Attach additional pages if needed.

See attached pages

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*
1/22/2025

B. The Equal Employment Opportunity Commission *(check one)*:

- [ ] has not issued a Notice of Right to Sue letter.
- [x] issued a Notice of Right to Sue letter, which I received on *(date)* ______________ .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C. Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

- [ ] 60 days or more have elapsed.
- [ ] less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

1. Damages for physical pain and emotional distress, to be determined in trial.
2. Economic damages, for wages not covered by PLO during second leave of absence; delayed completion of doctoral training; reduced future earning capacity. To be determined in trial.
3. Fees and costs of any legal representation I am able to obtain.
4. Punitive damages, the amount the court feels is appropriate.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 10/20/2026

Signature of Plaintiff: nicholas margolies

Printed Name of Plaintiff: Nicholas Margolies

### B. For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

1. From April 1 to April 22, 2024, Dr Guizzetti subjected me to **unequal terms and conditions of employment.**

2. On April 15-16 2024, Dr Guizzetti **retaliated** against me for using an accommodation.

3. From April 5 - April 22, 2024, Dr Guizzetti and Dr Hinds **did not engage in the ADA interactive process (items 4 – 10).**

4. On April 5, 2024, Dr Guizzetti told me she would not discuss accommodations with me.

5. On April 18, 2024, Dr Hinds responded to my request to develop accommodations by telling me it was not possible, and I would have to leave my position or the PhD program.

6. On April 19, 2024, Dr Hinds planned several ways to remove me from my position, rather than developing accommodations.

7. On April 19, 2024, Dr Guizzetti refused to meet to discuss accommodations.

8. On April 20, 2024, Dr Guizzetti expressed an intent to remove me from my position rather than develop accommodations.

9. On April 22, 2024, Dr Hinds advised Dr Guizzetti on how to remove me from my position rather than develop accommodations.

10. On April 22, 2024, Dr Guizzetti refused to develop accommodations.

11. On April 24, 2024 Dr Hinds and Kelsi Nagle Rowe **retaliated** against my request for the interactive process by removing me from my original position at Dr Guizzetti's request.

12. From April 23 – March 25, 2024, I continued to **advocate** that I had not received the interactive process, and to **request the interactive process** in my original position. During this time, OHSU **retaliated** against me. (Items 13- 25.)

13. In June 2024 OHSU threatened to dismiss me for the first time.

14. On September 18, 2024, OHSU threatened to dismiss me for a second time.

15. On September 25, 2924 Attorney Travis Leatham of Disability Rights Oregon advocated on my behalf.

Attachment A

16. From Sept 27 – Oct 3 2024, OHSU internally communicated about using academic policies to respond to my requests and justify my dismissal.

17. On October 21 2024, OHSU threatened to dismiss me for a third time.

18. On October 28, 2024, my colleagues advocated on my behalf.

19. On October 28, 2024, OHSU requested my leave of absence.

20. On October 31, 2024, OHSU gave me only one option to continue working and receiving pay and benefits, which carried a threat of dismissal.

21. On December 12, 2024, I filed a grievance with the help of the Graduate Researchers United union (GRU) for Discrimination of a federally protected class.

22. On January 8, 2025, GRU members delivered a petition to the desk of the President's Office requesting OHSU stop disability discrimination, and comply with the ADA. OHSU denied the claim and took no remedial actions.

23. On January 22, 2025, I charged OHSU with discrimination through EEOC.

24. On March 3, 2025, OHSU's civil rights investigative office (OCIC) concluded an investigation which did not investigate events I explicitly named in my complaint: retaliation on April 16 and refusal to engage in the interactive process on April 22.

25. On March 14, 2025, OHSU denied my complaint of discrimination and took no remedial actions.

26. On March 24, 2025, OCIC director Leah Leone told me I could not appeal OCIC's findings and no further action would be taken regarding my complaint.

27. I have suffered physical pain and emotional distress.

28. I have suffered economic damages.

29. I have suffered delayed completion of doctoral training.

30. I have suffered diminished competitiveness for grants and fellowships, and reduced future earning capacity.

# AMENDED CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| **CHARGE PRESENTED TO:** | **AGENCY CHARGE NO.** |
|---|---|
| EEOC<br>Oregon Bureau of Labor & Industries - Civil Rights Division | 551-2024-07371 |

Name *(indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.)*: Nicholas Margolies

Phone No.: 971-417-8926

Year of Birth: 1993

Mailing Address: 3414 Southwest 11th Avenue 4, PORTLAND, OR 97239

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: OREGON HEALTH AND SCIENCE UNIVERSITY

No. Employees, Members: 501+ Employees

Phone No.:

Mailing Address: 3181 SW SAM JACKSON PARK RD L585
PORTLAND, OR 97239, UNITED STATES OF AMERICA

Name:

No. Employees, Members:

Phone No.:

Mailing Address:

DISCRIMINATION BASED ON:

Disability, Retaliation

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 04/01/2024

Latest: 10/25/2024

THE PARTICULARS ARE:

On or about 2019, I was hired by Oregon Health and Science University, hereinafter Respondent, as a Research Assistant and currently hold the position of Graduate Researcher. I perform my duties in a satisfactory manner.

I have a disability and on or about April of 2024, I requested a reasonable accommodation. I informed Respondent that the accommodations granted were ineffective and requested to engage in the interactive process once more. I was told that no further accommodations would be granted and my only option was to find another role or be discharged. During this time, I was subjected to different terms and conditions of employment in being micromanaged by my supervisor while other Research Assistants were not. On or about October 25, 2024, I was informed that I would be discharged due to not finding another position, but this was paused after I filed a complaint to Respondent's civil rights office. I obtained internal communication involving my supervisor who stated her desire to discharge me.

I believe I have been discriminated against based on my disability, including retaliation, in violation of the Americans with Disabilities Act of 1990, as amended.



Attachment B

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Nicholas Margolies
01/22/2025

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

______________________________

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary______________________________

Printed Name ______________________________

# CP Enclosure with EEOC Form 5 (06/24)

## Privacy Act Statement

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **Form Number/Title/Date.** EEOC Form 5, Charge of Discrimination (10/24).
2. **Authority.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.
3. **Principal Purposes.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.
4. **Routine Uses.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.
5. **Whether Disclosure is Mandatory; Effect of Not Giving Information.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## Notice of Right to Request Substantial Weight Review

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## Notice of Non-Retaliation Requirements

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Seattle Field Office**
909 First Avenue, Suite 400
Seattle, WA 98104
(206) 576-3000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/23/2026

**To:** Nicholas Margolies
3414 Southwest 11th Avenue 4
PORTLAND, OR 97239
Charge No: 551-2024-07371

EEOC Representative and email: MICHAEL YOLLECK
INVESTIGATOR
MICHAEL.YOLLECK@EEOC.GOV

---

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 551-2024-07371.

On behalf of the Commission,

[signature] for
Elizabeth M. Cannon, Director
Seattle Field Office

July 23, 2026
Date

**Cc:**
Oregon Health & Science University
Please retain this Notice for your records.

Attachment C

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 551-2024-07371 to the District Director at CHRISTOPHER GREEN, 450 Golden Gate Avenue 5 West PO Box 36025, San Francisco, CA 94102.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 551-2024-07371 to the District Director at CHRISTOPHER GREEN, 450 Golden Gate Avenue 5 West PO Box 36025, San Francisco, CA 94102.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

## Notice Of Rights Under The ADA Amendments Act OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

Expanded statement

1. **From April 1 to April 22, 2024, Dr Guizzetti subjected me to unequal terms and conditions of employment.**

- On April 1, the day I returned, Dr Guizzetti released a "Lab Expectations" document
- The document included a section called "Google calendar time-tracking", stating "Use the Google calendar as way to track your time spent in the lab. The time spent working should add up(in average)to 40h/week."
- The document notes that if a lab member steps out even to take a walk, they should "please enter in the calendar the time you will be away and whether you are taking PTO (vacation/sick leave) or weather you plan in making up the time later in the day or another day (again, work reported in the calendar should add up in average to 40h/week)."
- This was a completely new policy. For the previous five years the lab culture had been for people to only note major events, such as an experiment or deadline, on Google calendar. Notifying whether PTO was being used on the shared calendar was also unprecedented.
- Dr Guizzetti told me to have the upcoming week's 40 hours of activities entered on the calendar by the Friday before
- I am unaware of others in the lab being held to these expectations at that time
- On April 5, Dr Guizzetti asked Dr Hinds if I needed to make up time taken off for medical appointments, and to confirm if she could exclude time I spent preparing for class – a requirement of my GR position – from my "research" time
- Dr Guizzetti told Dr Hinds that she felt my "productivity is still low with all these appointments and other things he is doing"
- At the time Dr Guizzetti assessed my productivity as "low", I had been back at work for less than 5 days. No assessment had been performed of my work duties, how they fit in with accommodations or how my performance would be evaluated.
- Dr Guizzetti then verbally informed me I could no longer include class attendance on my work calendar, which she had previously approved
- Dr Guizzetti told me this was because my union contract strictly required 40 hours of "work" per week, and class attendance was not work
- Dr Guizzetti requested that I enroll for 12 credits, instead of 9, as I had done previously, again saying this was necessary because of my union contract
- Dr Guizzetti used any failure to meet her strict deadline for submitting weekly reports and plans as a justification for failing me, which would place me into dismissal proceedings

Attachment D

- For example, on April 22, Monday at 2:03, Dr Guizzetti emailed Dr Hinds that I "did not submit the progress report of last week nor the plans for this week (which we agreed he would do every Friday, but 1pm). Should I tell him at the meeting that so far his progress is not of a passing grade?"
- To the best of my knowledge, no other members in the lab were evaluated this way
- Additionally, Dr Guizzetti's own actions contributed to my difficulty in meeting her deadlines; her refusal to discuss, implement and develop accommodations led to pain and injury which prevented me from working

**2. On April 15-16 2024, Dr Guizzetti retaliated against me for using an accommodation.**

- On April 12 2024, I emailed Dr Guizzetti that I could not meet due to knee pain, but intended to make up work over the weekend and send a report on Sunday
- This was covered in my accommodations letter, which approved me for flexible scheduling related to my disability.
- On April 15, Monday morning, I sent Dr Guizzetti a report of the work I completed over the weekend
- On April 15 Dr Guizzetti replied asking for two things she had never asked for before: the exact hours which I had been in the lab, because her colleague "was at the VA part of the day but did not see you", and "what was written in last week plan that you did not do"
- Dr Guizzetti did not acknowledge the work I reported to her as progress
- Dr Guizzetti concluded with "please try to complete things on the weekly plans' lists as you are falling behind. This is the third week of the term, and you are still working on items from week one (all of which are things that you planned to do last summer and again last fall)."
- Dr Guizzetti did not give any specific items of from week one, and I have no records of outstanding items from the previous summer or fall
- On April 16 at 11:50 Dr Guizzetti emailed Dr Hinds "Can we set up a meeting to talk about Nick?"
- On April 16 I sent Dr Guizzetti a research plan for the coming week
- Dr Guizzetti replied to my report: "I am sending back the file with your assessment of your last week productivity to which I added my comments; please read them, you will see that in several instanced I do not agree with your assessment. I want you to understand what productivity is, so please read my comments carefully."
- Dr Guizzetti took issue with my work writing code to create a composite figure for a manuscript. Dr Guizzetti had requested the figure in question on April 8. It was to

include finalized tracing images made on August 7 2023, which were revisions of files provided on September 9 2022, and first made on October 8 2021. All of these file versions had been previously emailed to Dr Guizzetti and approved.

- Dr Guizzetti wrote "In the past and again last week I asked the same thing .... I do not understand why you think I asked you something different .... This is what I asked in the past, and I am asking also now .... The files you sent me before did not have the figure I asked, and this is the reason I am asking for it again"
- Dr Guizzetti took issue with my statistical report. The formatting was unchanged since she had approved the first draft of the report on June 6 2022. However, she wrote that the formatting of the numbers was "obviously not OK".
- Dr Guizzetti attached comments on my submitted "weekly progress" report, which she evaluated using different criteria than in the past
- Dr Guizzetti evaluated any activity that did not generate a visible output, such as a discussion and brainstorming with a colleague, as "not an activity"
- My report referenced a particular work activity in three different ways, and Dr Guizzetti's three responses were (1) it was not work, (2) it was not new work, and (3) I did not do what I had done
- Dr Guizzetti marked notes of a type which had been fine before as "this was only a 2-minute conversation", "this could have only taken you 5 minutes", "how long did this take?"
- On April 17, Dr Hinds suggested to Dr Guizzetti that I could be required to make up time taken off for medical appointments, and to work additional hours
- Dr Guizzett had asked "Does Nick need to make up the time he takes off for doctor appointments?"
- Dr Guizzetti had also asked if she could "not count" time preparing for classes from my "research time"
- Dr Hinds replied "the best way to think of this is academically"
- Later that day, Dr Hinds replied "Based on Nick's schedule, the minimum number of hours he should spend in the lab this term is 36 hours. However he may need to spend more time to make academic progress."
- The requirement for 36 hours was based off of my 12 registered credits, which Dr Guizzetti requested I register for upon my return from medical leave, in contrast with previous terms where I registered for 9

- To the best of my knowledge, no other members in the lab were required to make up hours used for medical appointments

**3.** From April 5 - April 22, 2024, Dr Guizzetti and Dr Hinds **did not engage in the ADA interactive process (items 4 – 10).**

4. On April 5, 2024, Dr Guizzetti told me she would not discuss accommodations with me.

- April 5 was our first meeting after my return from medical leave
- Dr Guizzetti told me our meetings would be focused strictly on my research project, such as the details of carrying out an experiment or analyzing data. Topics outside of scientific progress would not be discussed.
- This prevented me from discussing the implementation of my accommodations with Dr Guizzetti through the coming weeks

**5. On April 18, 2024, Dr Hinds responded to my request to develop accommodations by telling me it was not possible, and I would have to leave my position or the PhD program**

- At 12:26 I reported concerns to Dr. Hinds about Dr Guizzetti, and requested help with accommodations, in an email titled "Help with accommodations and advisor"
- I noted that I did not fully understand the accommodations process or my rights in that process
- I wrote "I am reaching out in a pretty desperate effort to find out more about my rights re: interpreting / implementing / enforcing / adjusting accommodations."
- I requested help responding to and meeting with Dr Guizzetti because I felt pressured and unable to advocate for myself when meeting one-on-one
- I wrote that I hoped "to get, if I can, any advice on an appropriate way to respond when my PI wants to meet one on one this Friday, and I do not want to engage with her without a neutral third party"
- I noted that I felt "extremely threatened" regarding "being allowed to continue doing research"
- I noted Dr Guizzetti's policy about working hours and described how it was negatively impacting my health, as well as my work
- I wrote "My PI said I may go to medical appointments as long as I come in early and leave late to make up the hours. Doing this, I realized the very long days this results in are more than my body can handle. I have lost some of the progress I made in my recovery, by trying to make up full time hours in the lab. The quality of my work and my ability to work decreased as I tried to be present in the lab for more hours"
- I shared that I had experienced a flare-up event, my doctor supported my reducing my hours in the lab, and that I believed I could meet milestones if Dr Guizzetti and I could develop accommodations

- I shared changes in Dr Guizzetti's evaluation of my work directly after I used an accommodation
- I shared my concern that Dr Guizzetti's policy about work hours, and a lack of other evaluation criteria for my work, could lead to my dismissal
- I wrote that "Her various comments make it clear she is now grading this as an accounting of my hours for the week, and that I am failing"
- I wrote "In this environment, there is no way that anything I do can be considered enough"
- I referenced the impasse between Dr Guizzetti's opinion of my work and my records of the work I did
- I referenced Dr Guizzetti's unwillingness to even discuss accommodations with me
- I wrote "we are completely unable to reach a shared perspective on my work or discuss approaches to my working with physical limitations."
- I concluded that "there is nothing further I can do on my own to remedy this"
- I reiterated my fear for my position, saying I felt "anxious to protect myself so that I may have an opportunity to continue research"
- Later that day, I met with Dr Hinds who verbally advised me on my concerns
- Dr Hinds advised me that if Dr Guizzetti was not satisfied with my work, I was therefore not meeting the standards of the Behavioral Neuroscience program
- I told Dr Hinds that making up work hours missed for medical appointments, on the same day, led to 12 hour days which set back my physical recovery
- I told Dr Hinds that my primary care physician supported me in reducing my work hours at this time
- Unknown to me, having me work a fixed minimum number of hours, and even working additional hours, was something Dr Hinds had suggested to Dr Guizzetti.
- Dr Hinds had emailed Dr Guizzetti on April 17 2024, "Based on Nick's schedule, the minimum number of hours he should spend in the lab this term is 36 hours. However he may need to spend more time to make academic progress"
- Upon my request to modify my schedule, Dr Hinds not engage the interactive process
- Dr Hinds advised me that reducing my hours would violate my union contract and school policy, and used the phrase "there is no part time PhD"
- Dr Hinds advised me that, if I was struggling under these conditions, my only remaining option was to leave the PhD program

- Dr Hinds used the words "maybe you don't really need a PhD", "lots of students I advise realize they don't need a PhD, and are very happy without one", "you can still do what you want to do without a PhD".
- Dr Hinds asked me why I was pursuing a PhD; to imagine my life without a PhD, to reconsider my motivations for pursuing a PhD; and to discuss with her whether I thought I could be happy without a PhD
- I briefly described this in a report later submitted to Dr Lattal and Kelsi Nagle-Rowe on June 28 2024.
- I wrote "Meet with Monica to discuss my concern that what I can do and what/how Marina needs aren't matching. Monica brainstorms options like leaving phd program, maybe taking master's, or finding different lab."

6. **On April 19, 2024, Dr Hinds planned several ways to remove me from my position, rather than developing accommodations .**

- At 10:30, Dr Hinds and Dr Guizzetti met to discuss me
- At 10:56 , Dr Hinds emailed Kelsi Nagle-Rowe about my exiting with a terminal Master's degree, although I never expressed interest in this.
- Dr Hinds wrote "I have had discussions with Nick Margolies and Marina about the option of him switching to an MS degree. I am attaching his degree works and the BEHN guidelines (page 24 has MS). Based on this, I think he could write an MS thesis and meet the BEHN requirements. Do you agree with my assessment?"

7. **On April 19, 2024, Dr Guizzetti refused to meet to discuss accommodations.**

- I requested a meeting with Dr. Guizzetti to discuss accommodations with involvement from OHSU's Access Office
- At 11:50 I wrote "you've said you can advise me on research and my projects, but for other challenges I need to connect with other resources. I can't talk about my research and project plans without talking about my physical limits and abilities as I try to resume work in the lab and continue working on my physical recovery. What is possible and practical, and how does it fit with the BEHN program requirements / union contract / accommodations"
- At 1:48 Dr Guizzetti replied that instead of discussing accommodations, we meet to discuss the "options" Dr Hinds had proposed to me
- All of the options Dr Hinds had discussed with me involved me exiting the lab

- Dr Guizzetti wrote that we could "have the same discussion" with myself, Dr Hinds and OSA next week
- Later that day, Dr Guizzetti verbally requested that we have our usual meeting one-on-one
- Feeling pressured, I initially verbally agreed
- At 4:08, I emailed Dr Guizzetti, "I know when you asked me earlier today in the lab about meeting at 4 I said yes, but after some thinking I still believe the best thing would be to talk while someone from the access office or Monica is there. I'm sorry to change my response at the last minute. I will try to reach out to Monica and the access office to find out who is available when so we can all talk together."
- At 4:11 I received notification that Chennettee Jelleberg, director of OSA, was available to meet. I asked Dr Guizzetti to meet with us.
- Dr Guizzetti declined and stated that she would need Dr Hinds present.
- Chennettee and I discussed accommodations which could be implemented in my current position, allowing me to progress on my work in Dr Guizzetti's lab while preventing pain
- At 5:01 I informed Dr Guizzetti about the meeting Chennettee and I had without her; "we talked about ways I may be able to keep my research moving"

8. **On April 20, 2024, Dr Guizzetti expressed an intent to remove me from my position rather than develop accommodations.**

- at 2:30, on a Saturday, Dr Guizzetti forwarded to Dr Hinds the emails in which I request to meet to talk about accommodations
- Dr Guizzetti wrote, "Nick should not be in my lab past the end of the spring term. "
- Dr Guizzetti describes my written requests to meet to discuss accommodations as an attempt to manipulate her
- Dr Guizzetti wrote "The e-mail trail illustrates how he is trying to manipulate me into accepting his terms."
- Dr Guizzett wrote that at the meeting, she intended to inform me that she would fail me for a lack of progress
- Dr Guizzetti intended to fail me before engaging in any discussion on how to implement and develop my accommodations.
- Dr Guizzetti wrote "When Nick, you, Chennettee and I meet, I will make sure to let him know that, so far, his progress for this term of research does not reach a passing grade."
- Dr Guizzetti told Dr Hinds "I can accept the three options you proposed to him", all of which involved me exiting the lab

- Dr Guizzetti ranked her preferences of ways for me to exit the lab
- Dr Guizzetti wrote that her most favored choice was for me to change labs
- Dr Guizzetti wrote that she was "willing" to support me switching to a "terminal master", with limitations: she would pay my income and benefits only until the end of spring
- Dr Guizzetti wrote "The least favorite of the options is for him to take another LOA as it will just push the problem to a later time, but will not address it."
- Dr Guizzetti then further characterized the situation as "not sustainable"

**9. On April 22, 2024, Dr Hinds advised Dr Guizzetti on how to remove me from my position rather than develop accommodations.**

- At 7:55, Dr Hinds apologized to Dr Guizzetti about the "situation"
- Dr Hinds acknowledged Dr Guizzetti's suspicion of me, writing "I don't think Nick realizes how the trust in him has degraded"
- Dr Hinds proposed to focus the meeting on ways to remove me from the lab
- Dr Hinds, as my assigned accommodations "liaison", did not propose that we meet to engage in the interactive process
- Dr Hinds advised Dr Guizzetti to focus on academics, although I had explicitly requested a meeting about accommodations
- Dr Hinds wrote "I would propose we first listen to what Chennettee suggests and then repeat the 3 options that we spoke about. We have to make certain that we don't overly focus on the hours, but on the level of academic progress, and the misrepresentation of time spent on items."

**10. On April 22, 2024, Dr Guizzetti refused to develop accommodations.**

- I met with Dr. Guizzetti, Dr Hinds and Jon Pielaet, a member of OSA, to discuss accommodations
- I sought clarification regarding how my work and performance would be evaluated
- Dr Hinds stated that there was no way of evaluating my performance other than Dr Guizzetti's judgement
- I sought accommodations that would allow me to continue conducting research while managing pain flare-ups and mobility limitations associated with my disability.
- I described this briefly in a report submitted to Dr Lattal and Kelsi Nagle-Rowe on June 28 2024

- I wrote, "I am concerned that Marina wants an hourly accounting of 40 hrs progess/ week in the lab. But we cannot agree on what is 'progress'; it is difficult to be physically in the lab 40 hrs/week while still going to many dr appointments; and some weeks are better than others." .... "Jon suggests focus on meeting research goals vs 40 hrs / week" .... "Marina and Monica counter that this does not work in a phd setting"
- Dr. Guizzetti told me that accommodations would require me to leave her laboratory.
- As my accommodations liaison, Dr Hinds did not tell me I had a right to develop an accommodation in my current position
- I was not offered accommodations that would permit me to remain in Dr. Guizzetti's laboratory.
- I was not provided a meaningful opportunity to engage in an interactive process aimed at identifying accommodations that would allow me to continue working in my existing position.
- I understood the options presented to me as either leaving the laboratory or continuing without agreed accommodations.

**11. On April 24, 2024 Dr Hinds and Kelsi Nagle Rowe retaliated against my request for the interactive process by removing me from my original position at Dr Guizzetti's request.**

- On April 23 at 8 40, I emailed Dr Guizzetti, Dr Hinds, Jon Pielaet, and Chennettee Jelleberg requesting information about developing an accommodation by finding another lab to work in, as Dr Hinds and Dr Guizzetti had advised me
- My request was for information only
- I wrote "I've decided I need to look for a different lab. I don't know anything about this process so please tell me what you may know!"
- I described being unable to walk after coming in to my work desk in person
- I wrote "I am not able to come in person to the lab this morning, my knees are not good after pushing to come in yesterday."
- I described the steps I was taking to regain mobility and how I thought this would affect the ways in which I could work
- I wrote "I am arranging for a wheelchair and in process with handicap parking permit. This should make it less likely I will be unable to do an essential in-lab activity. But also takes some time to establish."
- I described my understanding of my accommodations at that time, and my desire to develop additional accommodations

- I wrote "I do not have any standing agreements on working from home. I hope to do meaningful work remotely today and ideally find a lab situation where this is a viable option"
- My expressed intent was to develop an accommodation to work with my physical limitations
- OHSU did not keep me in my current position while developing accommodations to address my need to use a wheelchair, including exploring whether a change in work duties or viable reassignment was possible
- On April 23 at 8 50, Dr Hinds responded by giving me a series of steps to follow
- Dr Hinds told me the first step was to meet with program director Dr Lattal
- Dr Hinds told me to contact Dr Guizzetti "about the necessary steps to wrap things up in her lab"
- On April 23 at 5:03, Dr Hinds forwarded my email to Kelsi Nagle Rowe
- Dr Hinds wrote "I received the request below from Nick Margolies in BSN to find a new mentor. We would like to initiate the loss of support mechanism from Graduate Studies to support Nick while he transitions out of Marina's lab"
- Dr Hinds writes that "we" would like to initiate the loss of support mechanism while I transitioned out of Dr Guizzetti's lab
- I did not request to initiate a loss of support mechanism
- I requested information regarding how to look for other possibilities
- I did not request to transition out of Dr Guizzetti's lab before identifying a new position
- On April 24, 2024, Dr. Guizzetti emailed Dr. Hinds asking whether I had been removed from her payroll.
- Dr. Guizzetti stated "I do not want [Nick] to think he can stay in my lab".
- Dr Guizzetti acknowledged that she had not yet told me my removal was already in process.
- Dr. Hinds responded that my effective removal date from Dr. Guizzetti's payroll was April 23, 2024
- On April 25 at 9 01, Kelsi Nagle Rowe emailed Dr Hinds and Dr Lattal that I had already been removed from my original financial support for the spring term
- Kelsi Nagle Rowe wrote, "FYI: I'm sending an email to Nick right now (you'll all be copied) about his approved Loss of Support for the remainder of the Spring term."

- On April 25 at 10 20, Kelsi Nagle Rowe emailed me, Dr Guizzetti, Chennettee Jelleberg, Dr Lattal, Dr Hinds, GR Admin, and Lisa Mendes in an email titled "Change of Mentor Approval"
- Kelsi Nagle Rowe wrote "I am writing to confirm that Graduate Studies has received your request to change your mentor. This request has been approved and the following steps/guidance should be followed"
- I was informed that I was now on emergency funding and needed to find a new mentor before that limited funding expired
- I was told to provide "all data, protocols, notebooks, and equipment to [Dr Guizzetti], by May 3, 2024, as part of your transition out of the lab"
- I could no longer continue my dissertation research in the laboratory where I had spent approximately five years developing specialized expertise.
- During OHSU's later investigation, Dr. Guizzetti stated that another individual had been hired to complete my project. Because my position had been filled by someone else, it was no longer available for me to return to.
- Another faculty member offered to co-mentor me as a way for me to remain in Dr Guizzetti's lab but add more computational work to my research, but Dr Guizzetti refused to this
- On May 2, Dr Guizzetti emailed Dr Lattal the faculty member "told me yesterday about the co-mentorship between me and [them which they] suggested to Nick; I wished [they] had talked to me. This co-mentorship is not possible and I told [them] so."
- On May 3 Dr Lattal replied "Good to know that a co-mentorship is not possible with you, Marina. We will see what we can work out and I'll keep you both posted."
- To the best of my knowledge, Dr Guizzetti did not offer any reasons when she refused to co-mentor me
- To the best of my knowledge, no OHSU representative asked Dr Guizzetti why the co-mentorship was not possible

**12. From April 23 – March 25, 2024, I continued to advocate that I had not received the interactive process, and to request the interactive process in my original position. During this time, OHSU retaliated against me. (Items 13- 25.)**

**13. In June 2024 OHSU threatened to dismiss me for the first time.**

- On June 19, Dr Lattal emailed Kelsi Nagle Rowe and Tamara Phillips-Richards that because I had been removed from Dr Guizzetti's lab but no new positions were available, I might be failed

- Dr Lattal wrote "I feel like I will need to give him a NP for research since he hasn't been in a lab since he left Marina's"
- On June 19 Kelsi Nagle Rowe replied, "I will also notify Allison that we may need to pursue dismissal due to the lack of mentor/NP grade for the spring."
- On June 20, Kelsi Nagle Rowe emailed me, Dr Lattal, Tamara Phillips-Richards, Dr Fryer, Dr Hinds, GR admin, Britt Hoover, and Lisa Mendes
- Kelsi Nagle Rowe wrote to me "you've not been able to secure a funded position at this time" and that this "could result in a request for academic dismissal from your program."
- Kelsi Nagle Rowe also informed me that, essentially, if I were failed I would not be eligible for another leave of absence to address my work-related injury on April 22
- Kelsi Nagle Rowe wrote "Please be advised that academic leave of absences must be approved by the SoM Associate Dean for Graduate Studies and that being in poor academic standing can affect your ability to take an approved leave of absence."
- On June 24, I met with Dr Lattal and Kelsi Nagle Rowe
- I related that I had been as active as possible in contacting other researchers, but their lack of funding prevented them from offering me a position
- I stated that their lack of funding was beyond my control, and not an academic failure
- Dr Lattal and Kelsi Nagle-Rowe concluded that if I submitted a report of my efforts to find a new position, it would be considered "work" for the term for which I could be passed
- Despite being passed for that term, I still faced dismissal if no new position became available

**14. On September 18, 2024, OHSU threatened to dismiss me for a second time.**

- Dr. Hinds informed me that dismissal proceedings would begin if I failed to secure a funded mentor within three weeks.
- Dr Hinds wrote, "I do think you may be down to two options at this time: 1. Return in the fall term, which includes 3 weeks of funding from graduate studies office, to find a mentor. If you have not secured a funded mentor after 3 weeks, then the dismissal process would be initiated. This would follow the OHSU Policy 02-30- 050, Student Suspension, Dismissal and Appeal process. 2. You have 1 remaining term for a leave of absence. You could take this term in the fall, while potential mentors await funding decisions."

- On September 23, 2024, I emailed Dr. Lattal "My next step from here is to try to find out why I can't return to my previous position to follow through with the accommodations process"
- On September 23 Dr Lattal replied "I'd like to also loop Monica and Kelsi into the discussion. How about tomorrow at 11:30 or Wednesday at 4?"
- On September 23 at 12 25, Dr Lattal forwarded my email to Kelsi Nagle Rowe, Dr Hinds, and Alex Breiding.
- Dr Lattal wrote "it sounds like he is still hoping to return to Marina Guizzetti's lab, which I think is a nonstarter for her. I have not talked with Marina about this in the past few months, but I did talk to Tamara the other day and she made it clear that Marina will not take him."
- Dr Hinds replied to Dr Lattal that my request for the interactive process is not what she recalled, despite my explicit written requests for it, including on April 18th
- Dr Hinds replied to Dr Lattal stating that the primary issues included my not meeting evaluation standards, and my unwillingness to engage in what was presumably a reasonable work task
- Dr Hinds described my circumstances – without a work assignment, facing dismissal – as the result of my "lack of clear communication" with Dr Guizzetti and my unwillingness to "report [my] efforts on a weekly basis".
- Dr Hinds denied that I had previously requested the interactive process
- On September 23, Dr Hinds wrote to Dr Lattal, "[Nick's] recollection of the situation with Marina is not what I recall. The primary issues were: 1. Communication – the lack of clear communication from Nick and 2. Reporting of hours and effort – Nick did not want to remain in a situation where he had to report his efforts on a weekly basis. It was not about the type of work and any issues with the accommodations."
- Dr Hinds' reply moved the conversation away from my request for the interactive process as described by the ADA, and into the School of Medicine's pathway for dismissing me
- On September 24, I replied to Dr Lattal "If Monica is in the meeting I wouldn't meet unless Jon Pielaet from the Access Office is able to arrange to be present, since he was there in the last meeting between Marina, Monica and myself, and it would be important to have a neutral third party who can speak to what was discussed. I'd also want my union steward there to take notes so I'd have a record."
- On September 24 I sent Dr Lattal an additional email stating "My main question at the moment is to find out why I can't return to my previous position to follow through with the accommodations process."

- I also wrote "Because it was represented to me that there was no interactive process available, I left, but that was a misrepresentation. Because I left my lab under a misrepresentation of what was available to me, it seems like I can be dismissed from the program. So I really want to understand what is the roadblock to me returning to my original position, in order to following the appropriate accommodation process there"
- On September 24 Dr Lattal replied "My concern at the program level is that we find you a mentor who can support you and we are running out of options for this term"
- Dr Lattal also asked what had happened in the meeting I mentioned on April 22.
- On September 24 I replied "I had met a few days earlier with Monica and one of the things I asked her was how to move forward with an additional accommodation in my position. I asked about reducing my hours, she told me that was not possible, and that if I wasn't able to work under the current conditions I could leave the lab or phd program"
- I wrote, "Marina was clear she would not consider it and reminded me of Monica's suggestion to leave the lab. At that time I did not know that the ADA included an interactive process to develop an accommodation in one's current position."
- "If I had been given an interactive process, I would still be in a funded position, and have been able to develop a reasonable accommodation to allow me to keep meeting the educational requirements."
- "If the reason I am ineligible for my position, is purely that I followed misrepresented and incorrect advising, then I feel like a different response should be taken than dismissing me from the program."
- I explained "The reason I don't want to meet with Monica in the meeting, unless Jon is able to be present, is that Monica is my assigned Program Accommodation Liason and I am stating that she gave me incorrect advising.
- I concluded, "I want to focus on what is standing between me and returning to my previous funded position"
- On September 25, Dr Lattal replied "A lot of this is grad studies/SOM level, which is why I suggested talking to Monica. She's the assistant dean of grad student affairs and the best person to talk to"
- "I would also suggest talking to Marina again if you want to try to rejoin her lab or work with her and Angela together, but it sounded like Angela would not agree to this without Marina"
- On September 25 at 10:14, Dr Lattal forwarded our conversation to Kelsi Nagle-Rowe, Dr Hinds, and Alex Breiding.

- Dr Lattal wrote "Here is my correspondence with Nick. I think the option of rejoining Marina's lab is extremely unlikely but that seems to be what he wants now, so I suggested he talk with her. I don't have anything else to offer him in terms of guidance for finding a mentor. His issues about perceived conflicts of interest (I don't understand his reasoning there) and accommodations are better addressed by you guys, so I will let you handle that"
- On September 25 at 11:01, Dr Hinds replied to the group conversation.
- Dr Hinds wrote "Kelsi and I are happy to meet with Nick about academic issues. I can try to set up a meeting with Nick, Jon and whoever Nick would like to bring, but we have to keep the conversation on academics."
- Dr Hinds also wrote "I do have a different memory of our discussions, but I can try to address that with Nick"

**15. On September 25, 2024 Attorney Travis Leatham of Disability Rights Oregon advocated on my behalf.**

- At 11:19, Travis Leatham emailed Dr Lattal, Chennettee Jelleberg, and OCIC
- Travis Leatham noted that "Mr. Marjolies' experience raises multiple concerns. First, it appears that Dr. Guizzetti may have retaliated against Mr. Marjolies for requesting and obtaining reasonable accommodations for his disability. Second, it appears that when Mr. Marjolies requested accommodations for his disability, Dr. Guizzetti and OSHU did not fully engage in the interactive process as required under the Americans with Disabilities Act."
- On Sept 25 at 1:35, Dr Lattal forwarded Travis Leatham's email to Dr Hinds and Kelsi Nagle-Rowe
- Dr Lattal wrote "Did you get this? I will just pass along to OHSU legal rather than reply unless you have different guidance..."
- On Sept 25 at 1 35, Kelsi Nagle Rowe emailed me, Dr Lattal, Dr Hinds, and Jon Pielaet, in an email titled "IMPORTANT: Academic Progress and Mentorship Meeting"
- Kelsi Nagle Rowe wrote, "Dr. Lattal has looped in myself and Dr. Hinds regarding your request to have a meeting with us, the Office of Student Access, and your union steward regarding your academic progress and plans to return to the Behavioral Neuroscience program in the Fall term.
- On Sept 25 at 1:46 Kelsi Nagle-Rowe emailed Dr Lattal, regarding Travis Leatham's email, "please send along to Emily Schultz in legal. I will loop in Labor"
- On Sept 25 at 1:59, Kelsi Nagle-Rowe forwarded Travis Leatham's email to Chennettee Jelleberg and Jon Pielaet

- Kelsi Nagle-Rowe wrote, "Could Monica and I set up a time to meet tomorrow to review the situation with Nick Margolies? We have also looped in OHSU legal to assist us."
- On Sept 25 at 2:15, Kelsi Nagle-Rowe forwarded Travis Leatham's email to Dr Fryer
- Kelsi Nagle-Rowe wrote "FYI: The situation with Nicholas Margolies has escalated. Nick is requesting a meeting with their union steward present, which is what the email attached references, but they have also now filed a complaint with Disability Rights Oregon, see email chain below."
- Kelsi Nagle-Rowe wrote "Keeping you in the loop that Monica and I have reached out to Emily Schultz for legal guidance. We have also reached out to set-up a meeting with the Office of Student Access. Would you like us to loop in Kelly or any one else in leadership? We'll keep you posted on what we hear back"
- On Sept 25 Kelsi Nagle Rowe emailed Dr Lattal and Alex Breiding "based on initial review, we have nothing to worry about as this is purely academic and about academic progress, so that's the approach we'll take".
- On Sept 25 at 2:39 I emailed Kelsi Nagle-Rowe, Dr Lattal, Dr Hinds, Jon Pielaet, and union.gru@gmail.com
- I wrote, "You said I requested a meeting regarding my academic progress and plans to return. For clarity to all involved, I want to recopy my original request to Matt. "My main question at the moment is to find out why I can't return to my previous position to follow through with the accommodations process"
- "I did not request a meeting regarding my academic process and plans to return. I asked for a meeting regarding the guidance I was given by my liaison for accommodations, the validity of my leaving the lab, and why I could not be returned to my position to follow the appropriate accommodations process."
- "I do NOT agree that this meeting is focused solely on academic progress, but rather that it involves my employment as well. I know there are grey areas with the student and employment aspect of being a graduate researcher, but in this case I am facing losing my employment AND student occupations. Further, I am facing losing these due NOT to an academic event, such as failing a core class or failing to complete my research project. I am facing losing these due to my efforts to achieve accommodation in my position. This is not "solely focused on academic progress or expectation.""
- On September 26, 2024, Emily Shults responded to Travis Leatham that my requests were not academically appropriate and could constitute a fundamental alteration of the graduate program.

- To the best of my knowledge, no appeal was made by the Behavioral Neuroscience program to the Access Office, claiming a fundamental alteration to be reviewed by experts in accommodations
- No efforts were made to propose alternative accommodations which could have allowed me to remain in my original position

**16. From Sept 27 – Oct 3 2024, OHSU internally communicated about using academic policies to justify my dismissal**

- On Sept 27 2024, Dr Hinds advised Kelsi Nagle-Rowe to focus on academic policy in justifying their removal of me from my original position
- At 9:14, Dr Hinds edited Kelsi Nagle-Rowe's draft
- Kelsi Nagle-Rowe had written a sentence explaining the procedures followed by the Graduate Studies office in my case
- Kelsi Nagle Rowe wrote "our office followed the following procedures: (1) GRU Contract Article 11, section 11.3-Performance Expectations and Failure to Reach Agreement (2) GRU Contract Article 8, Section 8.3.6-Terms of Stipend Payment-Loss of Support (3) School of Medicine Graduate Student Stipend Policy section 8, and (4) Academic Regulations for the School of Medicine Graduate Programs Article 1, Section 3.2.B-Academic Probation, Time Limits.
- Dr Hinds highlighted the academic policies, and commented "Put academics first"
- Dr Fryer approved Kelsi's draft, saying "I think your response to Nick is fine"
- At 2:05, Kelsi Nagle Rowe emailed me that my concerns regarding accommodations and my return to Dr. Guizzetti's laboratory would be addressed through academic processes.
- Kelsi Nagle-Rowe wrote "Thank you for clarifying your concerns. Regarding this meeting, I will maintain that the focus will be purely academic. Per the GRU contract (Article 1-Preamble), "The parties acknowledge and recognize that GRs are primarily students and that their employment status is contingent upon and arises out of the GR's standing as a student in an OHSU PhD program and the awarding of a stipend by OHSU."
- Kelsi Nagle Rowe also wrote, "The concerns you have presented below regarding accommodations, academic status, and the potential to return to Dr. Guizzetti's lab all fall under our School of Medicine academic processes and procedures. Any decision about your continuation in the Behavioral Neuroscience program will pertain to your academic standing as a student"
- On September 2024, Kelsi Nagle Rowe wrote an outline of my circumstances which omitted the events I kept requesting to discuss, and instead stated that I had been given the interactive process

- At 11:35, Kelsi Nagle Rowe emailed Dr Hinds, Dr Fryer and Kelly Caverzagie "I have another draft of the whole situation completed (about two pages) that we can use as a starting point for future conversations or documentation for a hearing, etc."
- On October 1, 2024, Dr. Fryer briefed OHSU administrators and legal counsel on a meeting she held with me
- Dr Fryer wrote that I repeatedly requested an opportunity to return to Dr. Guizzetti's laboratory and discuss accommodations so I could manage my pain
- Dr. Fryer noted that I told her I had been asked to leave the laboratory after requesting accommodation discussions.
- Dr Fryer noted that she did not respond to my comment, and instead repeated that I could not remain in the program without a mentor.
- On October 3, 2024, at 8:04, Dr Fryer emailed Kelsi Nagle-Rowe, Chennettee Jelleberg, Emily Shults, Dr Hinds, Angela Fleischer, Kelly Caverzagie, and Bridget Clough
- Dr Fryer copied my reply, in which I wrote "I also want to emphasize that Marina Guizzetti's lab ist still a suitable environment if she's willing to work with me and the access office to build a reasonable accommodation that complies with the ADA"
- Dr Fryer wrote, "I believe that Dr Guizzetti is no longer interested in mentoring Nick's dissertation research"
- Dr Fryer also wrote, "We don't offer part time PhD's so he would need to devote a minimum of 40 hours a week to make academic progress"
- At 8:39 Kelsi Nagle-Rowe replied, "I think it's fair for us to tell Nick that we can fund him during this time and assist him in trying to identify a new mentor with funding, but a this point the relationship with Dr. Guizzetti has reached an impasse and returning to her lab is not a suitable option to meet his needs for successful academic progress"
- "I don't know how legal feels, but I could see Labor asking us to offer Nick the entire Fall term to identify a new mentor, something we should be prepared for. Otherwise,after the next three weeks, if Nick hasn't been able to find a new mentor, we should follow academic policy and move to go to the dismissal process."
- At 8:59 Dr Hinds replied, "Could we compromise with labor and offer funding for the next 3 weeks – 10/7 to 10/25 – with the wording of continued mentor identification through the dismissal process. Otherwise, we are funding his dismissal in Winter term or Spring after he applies for another round of paid leave Oregon in 2025"
- At 11:40, Dr Fryer replied with her proposal "after discussing with Kelly and Kelsie"

- Dr Fryer wrote, "We will support him for an additional 3 weeks (to be consistent with the GRU contract)- but could offer to support his stipend for the whole fall term as long as it is not precedent setting.
- If he finds a mentor- wonderful, he can proceed as a graduate student, if not, we would advise him to withdraw, or would recommend him for dismissal for failure to make academic progress"
- At 12:03, Kelly Caverzagie replied saying "I think this is a very supportive plan for Nick"

**17. On October 21 2024, OHSU threatened to dismiss me for a third time.**

- 
- Kelsi Nagle Rowe emailed me, Dr Hinds, Dr Fryer, Dr Lattal in an email titled "Mentor and Rotation Update"
- Kelsi Nagle Rowe informed me that my funding would end on October 25, 2024
- Kelsi Nagle Rowe acknowledged Dr Guizzetti's refusal to work with me
- Kelsi Nagle Rowe linked a PI's willingness (or unwillingness) to work with a GR with the potential for academic growth
- Kelsi Nagle Rowe did not consider or address a PI's potential prejudice against a disabled GR or the interactive process
- This suggests that a PI could be prejudiced against a GR and the need for "academic growth" could be used to sanction the PI's refusal to work with a GR
- Kelsi Nagle-Rowe wrote, "I was notified that you've reached out to Dr. Guizzetti about returning to her lab. I'm sorry she declined your request, but I'm sure you must realize the student-mentor relationship must be mutually agreed upon to ensure an academic environment and mentoring relationship that will foster the successful academic growth of student"
- I was further informed that dismissal proceedings would be initiated if a new mentor was not identified.
- Dismissal proceedings were to be based upon academic policy and my lack of a research supervisor
- Kelsi Nagle Rowe characterized the dissolution of my work in the Guizzetti lab as "severing a relationship"
- Kelsi Nagle Rowe wrote, "Please see attached the emails regarding 12 weeks of funding and the links below to the relevant policies. If you have not been able to find a new mentor by October 25, 2024, the program will initiate a dismissal for failure to make appropriate academic progress and failure to acquire an advisor or research

mentor within limits set by the program (initially end of the spring term in the first year, and subsequently 12 weeks after severing a relationship with the first mentor)

- On October 22, I replied "I reached out to all the BEHN faculty on the list provided by Dr Allison Fryer who were accepting rotation students. Not one offered me an opportunity to rotate, despite my qualifications."
- I also want to respectfully disagree with the notion that I severed the working relationship with Dr. Guizzetti. I think it is important for the department to understand that Dr. Guizzetti asked me to leave the lab after I requested an interactive process for disability accommodation. I am not sure she was provided proper guidance on complying with the Americans with Disabilities Act.
- This situation is complex, which makes me grateful to read that the department is willing to go through the accommodations process with a new mentor. However, does the department know that they did not comply with the ADA accommodations process in the first case with Dr Guizzetti?"
- I did not receive a reply to this email or to this question
- I requested that OCIC notify the School of Medicine that I had requested an investigation on Sept 9, otherwise I would be dismissed

**18. On October 28, 2024, my colleagues advocated on my behalf.**

- My colleagues and members of the Graduate Researchers United union sent a letter to Dr Lattal, Dr Fryer, and Dr Hinds
- The letter stated, "It has come to our attention that our colleagues and friend, Nicholas Margolies, is facing dismissal from the graduate program for not having a mentor. Prior to their dismissal, they received an unexpected 'fail' for research credit as they managed a medical illness, putting them in immediate administrative peril. It is our understanding that Mr. Margolies was then asked to leave their lab after requesting an update to their disability accommodations. Graduate researchers have the right to an interactive process when requesting disability accommodations as mandated by the Americans with Disabilities act (the ADA). Our contract and OHSU student policy require faculty to comply with federal law by working with the OHSU office for Student Access to develop reasonable accommodations for students with a disability. By denying Mr Margolies the interactive process to develop reasonable accommodation and asking them to leave their position after making an accommodation request, OHSU is denying them their federally protected rights. Furthermore, reassignment under the ADA is a last resort option. The Behavioral and Systems Neuroscience Graduate Program and School of Medicine must be held accountable for misadvising faculty on students' rights under the ADA. We demand the immediate reinstatement of Nicholas Margolies back to his originally assigned laboratory with accommodation if he cannot be placed in

another suitable lab environment that can provide accommodations. Without appropriate action to comply with the ADA, we can only assume that the BEHN Program and School of Medicine do not respect our civil rights."

- The letter was signed by officers of GRU and my colleagues, 21 signatures in total
- OHSU did not respond to the letter

**19. On October 28, 2024, OHSU requested my leave of absence.**

- On October 28, 2024, at 11:31, Dr Fryer emailed me, Kelsi Nagle Rowe, Dr Hinds, Dr Lattal, Kelly Caverzagie, and Leah Leone in an email titled "LOA from your graduate program"
- Dr Fryer told me that I met the criteria for dismissal, but it would be paused only because of the OCIC investigation
- Dr Fryer recommended I take an unpaid leave of absence, without benefits, until the investigation concluded
- Dr Fryer wrote "I am sorry to learn that you have not found a mentor to support your dissertation research in Behavioral Neuroscience. You have exhausted the 12 weeks of support we offer to students who are changing research mentors. Without a research mentor, you will not be able to make academic progress in your program, and your graduate program would normally request that you be dismissed from the program. However, I have learned there is an open Office of Civil Rights Investigations and Compliance (OCIC) investigation into the circumstances leading to your seeking to change mentors, so the dismissal request has been paused, pending the outcome of the OCIC investigation.
- "As you have exhausted your 12 weeks of stipend support, we recommend taking a leave of absence from your program until the OCIC investigation is concluded. Please fill out the Leave of Absence (LOA) form for the Fall 2024 term or let me know if you would like Graduate Studies to do this for you."
- On October 29, at 11 30, I replied and again requested to be reinstated and given the interactive process in my original position
- I wrote "I do want to find a new lab. I am here and ready and able to work. As I see it, the department should still consider a means by which to comply with the ADA by reinstating me into my original position with accommodation, a position that I am more than qualified for. Is the BEHN/SOM considering this as an alternative option to taking a leave of absence or is a leave of absence the only option that the graduate program is willing to consider?
- On October 29 at 12 48, Dr Fryer responded "Any discussions regarding ADA will be managed through the OCIC investigation.

20. **On October 31, OHSU gave me only one option to continue working and receiving pay and benefits, which carried a threat of dismissal.**

- On October 31, Kelsi Nagle Rowe emailed me "You are still an active, registered student in the Behavioral Neuroscience Graduate Program, and an active Graduate Researcher, which means you are held accountable to the regulations, policies, and procedures of the Academic Regulations for the School of Medicine Graduate Programs and the GRU Collective Bargaining Agreement. "
- "If we do not hear from you by tomorrow, Nov. 1 at 4:00 PM regarding the option you would like to pursue, our office will automatically default your status to Option 2 and you will be placed on employment leave without pay/without benefits effective 5:00 PM tomorrow."
- Kelsi Nagle Rowe informed me that I could register and continue searching for mentors with what was left of my funding
- If I returned to search for a new work assignment and did not find one, I would be dismissed
- As of this point I had extensively contacted faculty and there were few to no possibilities left
- On November 1, I replied selecting to continue searching rather than take an unpaid leave without benefits
- I repeated again that I still wished to be reinstated and develop accommodations in my original position
- I wrote, "taking this decision does not imply any change in my position that I was was not allowed to perform my research duties in my originally assigned lab. It is my perspective that I agreed to seek rotations only for the purpose of receiving disability accommodations, because that was the only option given to me. I want to state again that I have requested multiple times to return to work with accommodation and that request has been continually ignored by the BEHN and SOM. I will accept searching for new placement as an alternative, and I am happy to work with BEHN and SOM to develop a plan to do so, if I continue to be refused the opportunity to return to work in Dr Guizzetti's lab."

21. **On December 12, 2024, I filed a grievance with the help of the Graduate Researchers United union (GRU) for Discrimination of a federally protected class.**

- The grievance stated, "Nicholas Margolies has a protected characteristic of disability. Emails by Marina Guizzetti and Monica Hinds indicate that Marina was predetermined to not comply with the accommodation ordered by the Office for Student Access or engage with the required interactive process. Instead, Dr.

Guizzetti placed undue pressure on Nicholas to either abandon his accommodation request or leave his research assignment."

22. On January 8, 2025, GRU members delivered a petition to the desk of the President's Office requesting OHSU stop disability discrimination, and comply with the ADA. OHSU denied the claim and took no remedial actions.

- On Jan 8 2025, members of the GRU delivered a petition to the desk of the President's Office
- The petition was titled "OHSU, stop disability discrimination now! Graduate programs must comply with the ADA", eventually collecting over 500 signatures
- The petition was directed to interim president Steven Stadum, and Drs David Robinson, Allison Fryer, Matthew Lattal, and Marie Chisholm-Burns
- The petition states "In extreme cases, students are also facing discriminatory action and even termination from graduate programs when making accommodation requests. OHSU's School of Medicine has failed to comply with the ADA by not properly training/advising faculty, allowing the removal of graduate students from research assignments after seeking accommodation"
- One request of the petition is "Comply with the ADA by giving all graduate students with disabilities an interactive process for developing an accommodation"
- Another request is "Graduate students who were advised to leave their assigned lab when seeking an accommodation will be immediately reinstated to their research assignment"
- On Feb 18 2025, executive board members of Graduate Researchers United (GRU) and an AFSCME representative met with OHSU representatives to discuss the petition
- OHSU representatives included Bridget Clough, labor relations; Michael Walsh, vice provost for student affairs; Kelly Caverzagie, Sr Associate Dean for SOM
- In the meeting, OHSU representation responded to the petition's first request by denying that any GRs were denied the interactive process
- Michael Walsh stated, "Number one was comply with the ADA by giving all graduate students with disabilities an interactive process for developing an accommodation. My answer to that would be we already do that. .... My answer this. We already are complying with the ADA."
- OHSU representation denied that any GRs were advised to leave their lab.
- This included Kelly Caverzagie, who had been included in Kelsi Nagle-Rowe's email on September 27, responding to DRO attorney Travis Leatham.

- In the email on which Kelly Caverzagie was copied, Travis Leatham had written "Mr. Marjolies was told that he would need to leave Dr. Guizzetti's lab if he could not perform the work without accommodations for his disability. My understanding is that Mr. Marjolies will be removed from the program unless Dr. Guizzetti agrees for him to return to the lab" .... "Essentially, Mr. Marjolies agreed to leave the supervision of Dr. Guizzetti under duress, when it was Dr. Guizzetti and the school administration's obligation to engage in a good faith effort to identify reasonable accommodations for his disability"
- Michael Walsh said "Grads advised to leave the lab... We don't advise people to leave the lab"
- Kelly Caverzagie said "I agree. It is not something Grad Studies would do"
- GRU president said "we do have a member who was advised by the PAL and the faculty before the interactive process started."
- Michael Walsh said, "I can't imagine a situation where grad studies would advise a student to leave the lab."
- GRU president said, "Yeah. It was the PAL, it happened and there is documentation"
- Michael Walsh said, "I can't imagine that someone in grad studies would advise someone to leave the lab."
- After first denying that Graduate Studies faculty would advise a GR to leave, OHSU representation then said Graduate Studies faculty *could* do so.
- OHSU representation linked the possibility of Graduate Studies faculty advising a GR to leave, with a GR leaving "on their own volition".
- Michael Walsh said "They can advise someone to leave the lab, but if a student does on their own volition that's their choice."
- The possibility that a GR could be pressured or coerced into leaving, and/or be removed without their consent, was not addressed by OHSU representation.
- OHSU representation then suggested that if a GR was advised to leave their lab, it was unconnected with whether the GR remained in their position
- Michael Walsh said, "Advising has nothing to do with the person leaving."
- At this point I still had more progress in my original research assignment than in my new one
- At this point, my PhD completion would still have been delayed the least by returning me to my original assignment
- OHSU did not respond to the petition's request by contacting me regarding my removal from my original position or taking any action to reinstate me to it

**23. On January 22, I charged OHSU with discrimination through EEOC**

- My complaint included a statement that "I requested to engage in the interactive process" and "I was told that no further accommodations would be granted and my only option was to find another role or be discharged. During this time, I was subjected to different terms and conditions of employment in being micromanaged by my supervisor while other Research Assistants were not"
- My complaint also stated "I was informed that I would be discharged due to not finding another position, but this was paused after I filed a complaint to Respondent's civil rights office. I obtained internal communication involving my supervisor who stated her desire to discharge me."

24. On March 3, 2025, OHSU's civil rights investigative office (OCIC) concluded an investigation which did not investigate events I explicitly named in my complaint: retaliation on April 16 and refusal to engage in the interactive process on April 22.

- On Sept 9 2024 I filed a complaint with OHSU's Office of Civil Rights Investigations and Compliance ("OCIC").
- In my complaint I cited events on April 16 and April 22: "On April 16 2024 her assessment standards changed suddenly after the onset of my condition .... On April 22 2024 she refused to consider additional accommodations"
- I gave the OCIC investigator documents to support my claim for April 16, and named a witness who was present on April 22.
- OCIC's interview statements with the respondents do not contain references to April 16 or April 22, 2024, despite those events being central to my claims.
- OCIC's conclusion skips from April 1 to April 23, omitting April 16 and April 22
- OCIC's closure memorandum states "Based on OCIC's review, the findings indicate no evidence of retaliation or discrimination as defined by policy"
- "Furthermore, there exists no substantiated evidence indicating retaliation against the Complainant in connection with their involvement in a protected activity"
- "The Respondent's proactive involvement, supportive measures, and overall conduct do not indicate any retaliatory actions linked to the Complainant's disability. Therefore, we conclude that the behavior in question fails to fulfill the criteria for retaliation and does not violate DHR Policy."

**25. On March 14, 2025, OHSU denied my complaint of discrimination and took no remedial actions**

- Emily Shults, OHSU Deputy General Counsel, responded to EEOC's notification of my charge of discrimination.

- Emily Shults stated three times that my claims were without merit
- Emily Shults wrote, "In the light most favorable to his Charge, Complainant alleges disability discrimination, and retaliation. Each of those claims is meritless."
- Emily Shults references the OCIC investigation to support her position
- However, the OCIC investigation did not investigate the events of April 16 and April 22, which are key to both my OCIC and EEOC complaints
- Emily Schults wrote, "after a thorough investigation detailed in the report, OCIC concluded that Dr. Guizzetti's decisions were not motivated in whole or in part by the Complainant's protected characteristic or disability."
- Emily Schults further requested that EEOC dismiss my case
- Emily Shults wrote, "Both because the EEOC lacks jurisdiction over this academic matter, and because Complainant's claims fail as a matter of law and fact, OHSU respectfully requests that EEOC dismiss Complainant's Charge and is deferring additional response to the EEOC's Request for Information pending the evaluation of the submitted information."
- At this point I still had more progress in my original research assignment than in my new one
- At this point, my PhD completion would still have been delayed the least by returning me to my original assignment
- Emily Schults did not respond to EEOC's notification by contacting me regarding my removal from my original position or taking any action to reinstate me to it

**26. On March 24, 2025, OCIC director Leah Leone told me I could not appeal OCIC's findings and no further action would be taken regarding my complaint.**

- On March 18, 2025 I sought information concerning an appeal process.
- On March 24, 2025, OCIC Director Leah Leone informed me that no internal appeal process existed for OCIC decisions.
- I was advised that I could pursue my grievances outside OHSU.

**27. I have suffered physical pain and emotional distress**

- I experienced injury on April 22 walking to the campus, through the research building and to my desk in Dr Guizzetti's lab.
- Because of Dr Guizzetti's previous response to my using an accommodation on April 16, I did not feel safe requesting to work from home that day
- I attempted to save my knees by driving to the campus parking lot, but no parking spots were available

- I therefore walked the .6 miles to the campus
- Walking caused me so much pain that I began having trouble breathing.
- In order to continue walking, I called a friend, Robert Kerseg, to talk me through the pain.
- At 1:13 I wrote to my doctor and, at my friend's suggestion, asked if I could get a handicap parking pass
- At 1:40 I also wrote to OSA: "After my doctor's appointment today, I found my knees ouchier than I expected, and it was too late in the day to get a spot reserved for parking. The (very short) walk to the lab took me an hour, and felt like scaling mount everest. I had to call a friend on the phone to help me keep going, because it was like walking on broken glass, I could barely catch my breath and several times I burst into tears. I just didn't know what else I could do. And now that I am here, it is awfully hard to think, all I can feel are my knees throbbing."
- At the end of the work day, I was in so much pain that I could only take very limited steps.
- Unable to walk home as usual, I called my friend Shea Anderson for help.
- Shea Anderson drove to campus and helped me get home, physically supporting me because I otherwise could not walk.
- The pain was so severe that I required the use of a wheelchair from April 23 until mid July
- This experience was so distressing that when discussing it with a counselor at the Student Health and Wellness Center, I began physically shaking.

**28. I have suffered economic damages**

- My injury from April 22 ultimately required a second medical leave to focus on recovery
- This second medical leave was only partially compensated by PLO
- Additionally, on April 23, 2024, I contacted Dr Guizzetti, Dr. Hinds and Kelsi Nagle-Rowe and noted that I was in physical pain after attending the lab in-person the day before, and needed to obtain a wheelchair and handicap parking permit
- I was not informed of my right to file a worker's compensation claim
- This prevented me from obtaining an immediate medical examination to thoroughly document that walking to my work desk caused my re-injury, critical to receiving worker's compensation.

**29. I have suffered delayed completion of doctoral training.**

- My PhD completion was pushed back by two years

**30. I have suffered diminished competitiveness for grants and fellowships, and reduced future earning capacity.**

- I lost not only the two years of dissertation research in Dr Guizzetti's lab during my time as Graduate Researcher, but the four years of specialized training in the techniques used by Dr Guizzetti's lab during my time as Research Assistant

- I lost my original career track, which linked my Master's in Molecular Biology with the cumulative 5+ years of experience in the Guizzetti lab's area of research

- My 7+ years of previous training does not directly apply to the new position which was available to me

- This transition to a new field in which I have no background has been listed as a major weakness by reviewers and as a reason for denying my application for a federal doctoral fellowship in my new position